UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK DILLARD,

                Petitioner,                   Case No. 18-13158

v.

                                    HON. MARK A. GOLDSMITH

MARK McCULLICK,

                Respondent.

_____/

**OPINION & ORDER**
**(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING**
**CERTIFICATE OF APPEALABILITY, AND (3) GRANTING LEAVE TO PROCEED IN**
**FORMA PAUPERIS ON APPEAL**

Petitioner Mark Dillard, a state prisoner in the custody of the Michigan Department of Corrections, filed a pro se habeas corpus petition under 28 U.S.C. § 2254 (Dkt. 1). Petitioner was convicted of the following crimes: first-degree felony murder, Mich. Comp. L. § 750.316(1)(b); second-degree murder, Mich. Comp. L. § 750.317; armed robbery, Mich. Comp. L. § 750.529; and possession of a firearm during the commission of a felony, Mich. Comp. L. § 750.227b. Petitioner's convictions were affirmed on appeal. Petitioner raises two claims for relief. First, he states that he is entitled to a new trial because he acted in self-defense, which would have been a complete defense to the murder charge. Pet. at PageID.5. Second, he states that the trial court deprived him of due process and a fair trial by denying his request for jury instructions on manslaughter and self-defense and by omitting relevant jury instructions on a witness's prior inconsistent statements and Petitioner's out-of-court statements. Pet. at PageID.7, 45–55.

In its answer to the habeas petition, the State argues that Petitioner waived or procedurally defaulted his first claim and portions of his second claim and that the state appellate court

reasonably held that Petitioner's other claims lacked merit.  Answer in Opp'n to Pet. at PageID.76–77 (Dkt. 9).  The Court agrees.  Accordingly, the Court denies the petition.

## I.  BACKGROUND

Petitioner was charged with the following three counts in Michigan's Wayne County Circuit Court:  (i) first-degree premeditated murder and first-degree felony murder, (ii) armed robbery, and (iii) felony firearm.  The charges arose from the fatal shooting of Anthony Northern at approximately 10:40 a.m. on September 24, 2015 in Detroit, Michigan.

At Petitioner's trial, recordings of  two emergency 911 calls to the Detroit Police Department were played for the jury.  One of the two anonymous callers reported at 10:42 a.m. on September 24, 2015 that "a man [was] shot up in a green Lincoln Navigator" at Eight Mile Road and Gratiot Avenue.  1/26/16 Trial Tr. at PageID.557 (Dkt. 10-6).  The caller described the shooter as wearing a "white T-shirt, green pants, [and] dreads in his head."  Id. at PageID.558.

One minute after the first 911 call, another person reported the shooting at Eight Mile Road and Gratiot Avenue, but this caller stated that the vehicle was a blue SUV.  Id.  She stated that the shooter wore all black clothes, had "dreads" on his head, had a medium complexion, and was about thirty years old.  Id. at Page ID.558–559.  She also reported that "it looked like someone was fighting in the car," id. at Page ID.558, and that the shooter got out of the car, shot the victim, and began walking away, id. at PageID.560.

The victim's son, Demario Northern, testified that his father routinely kept a .38 caliber snub nose revolver in the center console of his father's green Lincoln Navigator.  Id. at PageID.436–437.

Jeremy Drake was one of the first police officers to respond to the crime scene.  He found the victim slumped over in the driver's seat of a Lincoln Navigator near Eight Mile Road and

Gratiot Avenue.  Id. at PageID.450–455.  The Lincoln Navigator was on the sidewalk, rammed against the fence of a car lot.  Id. at PageID.454.  The victim had an apparent gunshot wound to the side of his head, and he appeared to be dead.  Id. at PageID.455.

Forensic technician Angela Anderson-Cobb went to the scene and noticed that the center console in the vehicle was open.  Id. at PageID.478.  Inside the console was a wallet that contained identification and credit cards but no cash.  Id. at PageID.478–480  A cigar or cigarillo wrapper was nestled in the seat cushion.  Id. at PageID.493.

Detroit Police Officer Robert Gadwell went to a gas station at the corner of Eight Mile Road and Gratiot Avenue and acquired a videotape, which showed the victim's vehicle creep up and then roll backwards as a man exited the passenger door.  Id. at PageID.508–511.  The man briefly walked alongside the car and then slowly jogged away.  Id. at PageID.517–519.

Dr. Leigh Hlavaty performed the autopsy on the victim.  She testified that the victim had a gunshot wound to his head and fresh abrasions on the back of his right hand.  Id. at PageID.532–533.  She also testified that the cause of death was a gunshot wound to the head, and the manner of death was homicide.  Id. at PageID.537–544.  Dr. Hlavaty stated that the victim had been shot at close range and that his blood alcohol content was .25 percent.  Id. at PageID.532, 535.

Officer Darnell McDaniel was assigned to the Detroit Public School District on the day of the shooting.  He was on patrol in a marked car around 11:00 a.m. when he heard a dispatch about the shooting.  Id. at PageID.562.  He subsequently saw someone who fit the description of the suspect—a brown-skinned male who was wearing a white T-shirt and black pants and had dreadlocks.  Id. at PageID.563.  Officer McDaniel testified that the person "came out of nowhere" and was walking away from Gratiot Avenue with a black shirt in one hand.  Id. at PageID.563–565.  The suspect disappeared while McDaniel made a wide turn.  Id. at PageID.568.  On October

3

5, 2015, McDaniel identified Petitioner in a photo line-up as the person he saw at the corner of Reno and Eastburn Streets on September 24, 2015. Id. at PageID.572. He also identified Petitioner at trial as that person. Id. at PageID.564.

Sergeant Steven Ford of the Detroit Police Department determined from a record of the victim's use of debit cards that the victim had been to two liquor stores before the shooting. Id. at PageID.601. Sergeant Ford extracted videotapes from both stores. Id. at PageID.601, 603. The videotape acquired from the first location showed the victim pulling into the parking lot in his Lincoln Navigator alone. Id. at PageID.605. The victim was alone in the store, and when he left, he got back into his car alone. Id. at PageID.606.

The victim then went to another liquor store. He was by himself inside the store, but when he left the store and got into his vehicle, a second person, who was wearing a white T-shirt, was seated in the passenger seat. Id. at PageID.608–612. The victim then went back to the first liquor store. 1 /27/16 Trial Tr. at PageID.624 (Dkt. 10-7). When the victim exited the car, Petitioner also exited the car, and the two men went into the store. Id. at PageID.626. The victim appeared to make a purchase for himself and for Petitioner inside the store, and they both got into the victim's vehicle after leaving the store. Id. at PageID.628.

On cross-examination, Sergeant Ford stated that there did not appear to be any anger or tension between the victim and Petitioner inside the store and that there was no evidence of a pre-existing conflict between the two men. Id. at PageID.637–638. The murder occurred about seventeen minutes after the victim left the first liquor store for the second time and 4.3 miles away from that store. Id. at PageID.642–644.

Andrea Young, an expert in DNA analysis, testified that both Petitioner and the victim were possible contributors to DNA found on the cigarillo wrapper that was taken from the victim's

car.  Id. at PageID.687–688, 691–692.  All the other swabs that Ms. Young received either were

not suitable for comparison or excluded Petitioner as a major donor.  Id. at PageID.691.

Dean Molinar, an expert in firearms and toolmark analysis, received a fired bullet fragment

for analysis.  Id. at PageID.697–698.  He concluded from his analysis that the item was consistent

with a 38/9 millimeter fired bullet.  Id. at PageID.700.  He did not receive a firearm for analysis,

but he thought that the bullet fragment was probably fired from a pistol, as opposed to a rifle.  Id.

at PageID.702.

Detroit police officer Treva Eaton testified that, based on a tip from someone who saw a

picture of the suspect on television, she and other officers set up surveillance at several locations,

including the home of Petitioner's sister.  Id. at PageID.714.  Petitioner was arrested on October

6, 2015, after he was seen getting into a vehicle by his sister's home and riding in a vehicle driven

by his sister.  Id. at PageID.715–719.

Corporal Ki Sobol worked for the Wayne County Sheriff's Office and monitored all phone

calls at the Wayne County Jail.  Id. at PageID.722.  One call at the Wayne County Jail was played

for the jury, but it was not transcribed.  Id. at PageID.726.  However, the prosecutor explained in

closing argument that, during the call, Petitioner tried to convince his relatives and his former

girlfriend, Latrisha Ward, to get rid of the gun.  1/28/16 Trial Tr. at PageID.923 (Dkt. 10-8).

Ward testified that she lived about six or seven blocks from the intersection of Eight Mile

Road and Gratiot Avenue and that she dated Petitioner at one time.  1/27/16 Trial Tr. at

PageID.728–729.  On September 24, 2015, she and Petitioner communicated with each other by

phone, and Petitioner came over to Ward's house while wearing a white T-shirt.  Id. at PageID.730,

749.  During a subsequent interview with two police officers, Ward stated that Petitioner told her

that, while he was on the way to Ward's house that day, he saw a Detroit police officer.  Id. at

PageID.743.  On cross-examination, Ward testified that when Petitioner called her on September 24 prior to arriving at her house, he said, "I had to do it, I had to do it."  Id. at PageID.761.

Ward and Petitioner also communicated with each other on October 6, 2015.  Id. at PageID.752.  Petitioner told her that "the feds" were sitting behind a building on the next block but that they did not yet know who he was.  Id. at PageID.753.  Ward informed Petitioner that she would be one of the first people they questioned and that she would feel it was her fault if he got "jammed up" at her place.  Id. at PageID.756.  Petitioner responded, "That's only if somebody snitch[ed] on me[.]"  Id. at PageID.757.

Police officer Michael McGinnis testified as an expert in cell phone mapping and analysis. Id. at PageID.790.  He concluded from an analysis of cell phone records that the cell phone associated with Petitioner traveled to the crime scene at a time consistent with the homicide and then went slightly west.  1/28/16 Trial Tr. at  PageID.811–812.  The cell phone associated with the victim was also at the crime scene and traveled slightly west.  Id. at PageID.820–822.  There were no outgoing communications from the victim's phone after the 911 calls.  Id. at PageID.833.

Paytra Williams was the officer in charge of the case.  She explained how the investigation of the homicide progressed, including how she learned that the victim's cell phone and revolver were missing after the homicide, and latent fingerprints obtained from the victim's vehicle were not usable.  Id. at PageID.840–841, 845.  Before the police obtained Petitioner's name, they released to the media a photo taken from the video that showed the last person seen with the victim. Id. at PageID.846.  The police subsequently received a tip and began to look for Petitioner.  Id. at PageID.848.  Officer McDaniel picked Petitioner's picture out of a group of six photos on October 5, 2015, and Petitioner was arrested on October 6.  Id. at PageID.849–850.

In addition, Officer Williams testified that, during an interview with Ward, Ward provided information that only Petitioner would have known.  Id. at PageID.858–859.  This information included the fact that the victim possessed a gun when the homicide occurred and that the victim was shot with his own gun.  Id. at PageID.879.

Petitioner stated during an interview with police that he had been selling marijuana on the corner and that the victim had bought several bottles of wine.  Id. at PageID.868.  That information was consistent with bottles recovered from the victim's vehicle.  Id.  The gun used to kill the victim was never found.  Id. at PageID.877.

At the conclusion of the prosecution's case, Petitioner waived his right to testify and did not present any witnesses.  Id. at PageID.891–892.  Defense counsel requested a jury instruction on voluntary manslaughter and self-defense, but the trial court denied the request.  Id. at PageID.893–912.

Defense counsel subsequently argued to the jury that there were several reasons to doubt whether Petitioner planned to kill the victim, whether he committed a robbery, and whether he possessed a firearm.  Id. at PageID.944.  Defense counsel argued in the alternative that the jurors should find Petitioner guilty of second-degree murder if they believed that Petitioner was responsible for the victim's death but did not think the crime was premeditated or felony murder. Id. at PageID.945.  On January 29, 2016, the jury convicted Petitioner of felony murder; second-degree murder as a lesser-included offense of first-degree premeditated murder; armed robbery; and felony firearm.  1/29/16 Trial Tr. at PageID.985–986.

The trial court merged the two murder counts for purposes of sentencing, id. at PageID.995, and sentenced Petitioner to two years in prison for the felony-firearm conviction, to be followed

by life imprisonment for the murder and a concurrent term of 18 to 40 years for the armed robbery, id. at PageID.1000.

Petitioner appealed his convictions, raising the same claims that he has presented to this Court in his habeas petition.  The Michigan Court of Appeals affirmed Petitioner's convictions. People v. Dillard, No. 332340, 2017 WL 3567546 (Mich. Ct. App. Aug. 17, 2017).  The Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues presented to it.  See People v. Dillard, 908 N.W.2d 907 (Mich. 2018).

Petitioner then filed a habeas petition.

## II.  STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes "important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases."  Shoop v. Hill, 139 S. Ct. 504, 506 (2019).  Under the statute, a federal court may grant habeas corpus relief only if the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 405 (2000).  An "unreasonable

application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409.

The United States Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Therefore, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (punctuation modified). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (punctuation modified). To obtain habeas relief in federal court, a state prisoner must show that the state-court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

A state court's factual determinations are presumed to be correct on federal habeas review. See 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence. Id. For claims that were adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

## III. DISCUSSION

### A. Habeas Petition

Petitioner raises two claims for relief. First, he argues that he is entitled to a new trial because he acted in self-defense when the victim was killed, and self-defense would be a complete defense to the murder charge. Second, he argues that trial court deprived him of due process and

9

a fair trial when the trial court failed to give jury instructions that he requested and omitted other relevant instructions that he did not request.  The Court addresses each claim for relief in turn.

### 1. Request for New Trial

Although Petitioner acknowledges in his petition that he did not submit a self-defense argument on his behalf, he states that the omission of a jury instruction on self-defense resulted in a miscarriage of justice and that a self-defense theory could have created a reasonable doubt in the jurors' minds and garnered him an acquittal.  Pet. at PageID.45–47.  He asks the Court to remand his case to the trial court so that he can bring a motion for new trial.  Id.

The Michigan Court of Appeals noted that, in contending that he should be granted a new trial because if he had asserted self-defense at trial, he might have been acquitted, Petitioner was not challenging a particular ruling by the trial court.  Dillard, 2017 WL 3567546, at *1.  Rather, Petitioner sought to have the Michigan Court of Appeals remand to the trial court, but the Michigan Court of Appeals had already denied Petitioner's motion for a remand.  Id.  Therefore, the court stated that "there is nothing for this appellate Court to review."  Id.  It also explained that, if it were to decide the issue on the merits, it would find that Petitioner was not entitled to a new trial because Petitioner intentionally chose to forego a claim of self-defense at trial and could not use that decision as a basis for a new trial.  Id.  Accordingly, the court concluded that Petitioner waived the defense of self-defense at trial and, therefore, waived appellate review of the issue.  Id.

"A waiver ordinarily is an intentional relinquishment or abandonment of a known right or privilege."  Johnson v. Zerbst, 304 U.S. 458, 464 (1938).  The determination of whether there has been an intelligent waiver "must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  Id.

10

Because waiver "extinguishes an error" under the plain error rule, a court "cannot review the supposed error at all." United States v. Montgomery, 998 F.3d 693, 697 (6th Cir. 2021).

As the Michigan Court of Appeals pointed out, Petitioner caused the absence of a self-defense argument when he directed his trial attorney not to pursue a self-defense strategy. Dillard, 2017 WL 3567546, at *1.   The record, as summarized by the Michigan Court of Appeals, shows that:

> [b]efore voir dire commenced, defendant's trial counsel addressed the trial court. Defendant's trial counsel had planned on pursuing a self-defense strategy during trial, but on that day, defendant informed his counsel that he "no longer wish[ed] to go forward with any type of self-defense claim," and as a result, defendant's trial counsel felt he was "a little hamstrung."   In response, the trial court agreed to adjourn to allow counsel time to prepare a new defense.

Id.; see also 1/21/16 Trial Tr. at PageID.240–243 (Dkt. 10-5).   The court concluded from the record that it was "abundantly clear that [Petitioner] intentionally chose to forego any claim of self-defense at trial." Dillard, 2017 WL 3567546, at *1.

Further, at the close of the prosecution's case, Petitioner chose not to testify, even though his testimony would have been an opportunity to raise a self-defense theory, and he informed the trial court that he agreed with what defense counsel planned to argue to the jury.  1/28/16 Trial Tr. at PageID.891–892.   Although defense counsel subsequently asked the trial court for a jury instruction on self-defense, id. at PageID.894–899, 903–905, Petitioner admits in his habeas memorandum of law that his actions caused the situation that led the trial court to deny his request for a jury instruction on self-defense.  See Pet. at PageID.47.

In light of these considerations, the Court concludes that Petitioner waived his right to present a self-defense theory and that it is not necessary to review the merits of his first claim. See Montgomery, 998 F.3d at 697–698.

11

### 2. Jury Instructions

Petitioner next argues that the trial court deprived him of his Fifth and Sixth Amendment rights to due process and a fair trial when the court failed to instruct the jury on (i) the lesser offense of voluntary manslaughter and the affirmative defense of self-defense and (ii) Ward's inconsistent statements and Petitioner's out-of-court statements.  Pet. at PageID.48–52.

The Michigan Court of Appeals determined that Petitioner preserved his claim about the denial of his requests for jury instructions on manslaughter and self-defense but that Petitioner did not preserve his claim about the lack of jury instructions on Ward's prior inconsistent statements and Petitioner's out-of-court statements.  Dillard, 2017 WL 3567546, at *2.

The Court first discusses the issues that the Michigan Court of Appeals deemed preserved and then turns to those that it deemed unpreserved.

### a. Preserved Issues

The Constitution requires criminal prosecutions to "comport with prevailing notions of fundamental fairness."  California v. Trombetta, 467 U.S. 479, 485 (1984).  The Supreme Court has "interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense."  Id.  A necessary corollary of the meaningful opportunity to present a complete defense "is the rule that a defendant in a criminal trial has the right, under appropriate circumstances, to have the jury instructed on his or her defense, for the right to present a defense would be meaningless were a trial court completely free to ignore that defense when giving instructions."  Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002).

This rule, however, does not give a defendant the right to offer any defense, nor to demand that a jury be instructed on any theory.  Id. at 853.  Rather, "a defendant is entitled to an instruction

as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63 (1988).

In addition, "[g]enerally speaking, a state court's interpretation of the propriety of a jury instruction under state law does not entitle a habeas claimant to relief." Rashad v. Lafler, 675 F.3d 564, 569 (6th Cir. 2012). "The exception is when the instruction is so flawed as a matter of state law as to infect[ ] the entire trial in such a way that the conviction violates federal due process." Id.

On habeas review of jury instructions, the petitioner must show that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Keahey v. Marquis, 978 F.3d 474, 477 (6th Cir. 2020) (quoting 28 U.S.C. § 2254(d)(1)). Even then, the petitioner "must show that the mistake violated concrete Supreme Court holdings, not generalized principles." Id. at 478.

### 1. Manslaughter Instruction

Petitioner asserts that the trial court should have instructed the jury on manslaughter because manslaughter is a lesser-included offense of murder. Pet. at PageID.50–51. He maintains that, if the trial court had instructed the jury on manslaughter, he might have been convicted of manslaughter based on two pieces of evidence: (i) a 911 call in which the caller described a fight between the shooter and the victim and (ii) Ward's testimony that, after the shooting, Petitioner told Ward that "I had to do it." Id.

The Court finds no merit in Petitioner's claim because the "failure to instruct on a lesser included offense in a noncapital case is not such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." Scott v. Elo, 302 F.3d 598, 606 (6th Cir. 2002) (punctuation modified). Even if

Petitioner's claim were cognizable here, "due process entitles a criminal defendant to an instruction on a lesser included offense '<u>only</u> when the evidence warrants such an instruction.'" <u>Allen v. Morris</u>, 845 F.2d 610, 617 (6th Cir. 1988) (quoting <u>Hopper v. Evans</u>, 456 U.S. 605, 612 (1982) (emphasis in original)).

> The Michigan Court of Appeals explained on review of Petitioner's claim that:
>
> "'[T]he elements of voluntary manslaughter are included in murder, with murder possessing the single additional element of malice.'" <u>People v. Reese</u>, 491 Mich. 127, 144; 815 N.W.2d 85 (2012), citing <u>People v. Mendoza</u>, 468 Mich. 527, 540; 664 N.W.2d 685 (2003). As such, "to show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." <u>Mendoza</u>, 468 Mich. at 535. "'The provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason'; that is, adequate provocation is 'that which would cause the reasonable person to lose control.'" <u>People v. Roper</u>, 286 Mich. App. 77, 87; 777 N.W.2d 483 (2009), quoting <u>People v. Pouncey</u>, 437 Mich. 382, 389; 471 N.W.2d 346 (1991).

<u>Dillard</u>, 2017 WL 3567546, at *2. The Michigan Court of Appeals rejected Petitioner's contention that the trial court should have given jury instructions on manslaughter because there was no evidence that Petitioner was acting in the heat of passion during the fight or killing. <u>Id.</u> at *3.

In his petition, Petitioner points out that one of the 911 callers described a fight in the car, that Ward testified that Petitioner told her he "had to do it," and that the victim had fresh abrasions on the victim's hand. But Petitioner has not explained what happened or why he "had to do" anything. A 911 caller described a fight, and Petitioner apparently informed the police that the victim grabbed Petitioner's arm,[1] but Petitioner could have initiated the fight, and the victim's

---

[1] The record before the Court does not contain a transcript of the interview. However, according to the trial court's findings of fact, which the trial court made during its ruling on defense counsel's motion for jury instructions on manslaughter and self-defense, Petitioner informed the police that the physical contact inside the vehicle was limited to the victim grabbing his arm. 1/28/16 Trial Tr. at PageID.907–908.

abrasions could have been defensive wounds.  There was no evidence that Petitioner was harmed during the incident, and, presuming the victim grabbed Petitioner's arm, such action would not constitute adequate provocation.

Further, the evidence supported the prosecution's theory that the victim's phone and gun were stolen during the incident and that the victim was shot with his own gun.  One of the 911 callers seemed to say that the shooting occurred after the shooter exited the victim's vehicle.  See 1/28/16 Trial Tr. at PageID.887.  When ruling on defense counsel's motion for a jury instruction on manslaughter, the trial court described a video of the incident as showing the suspect either outside the vehicle or inside the vehicle with the passenger door open when the shooting occurred. See id. at PageID.908–909, 911.  There was additional evidence that Petitioner lingered briefly alongside the victim's vehicle and then left the scene instead of contacting the police or seeking medical help for the victim.

In the absence of any credible evidence that Petitioner killed the victim in the heat of passion caused by adequate provocation, the Michigan Court of Appeals reasonably concluded that the trial court did not err when it refused to instruct the jury on voluntary manslaughter. Petitioner is not entitled to relief based on this claim.

### 2.  Self-Defense Instruction

Petitioner contends that the trial court also should have instructed the jury on self-defense. Although Petitioner waived the defense of self-defense at the beginning of trial, defense counsel requested a jury instruction on self-defense at the close of the prosecution's case.  Petitioner makes arguments that are similar to those defense counsel made to support the request for a jury instruction on self-defense at trial.  See 1/28/16 Trial Tr. at PageID.893–899.  Petitioner points to the following pieces of evidence: (i) one of the 911 callers said that it looked like there was a fight

between the shooter and the victim; (ii) the victim had abrasions on his knuckles; (iii) there was no evidence of any interaction between Petitioner and the victim before the day of the incident; (iv) the victim's son testified that the victim's weapon was concealed when another person was in the vehicle and that the victim's son had never seen Petitioner prior to the incident; and (v) the victim had a high blood alcohol level at the time of death.  Pet. at PageID.51–52.

The trial court denied defense counsel's request for a jury instruction on self-defense because Petitioner had not satisfied the standard for self-defense.  The court stated that there was no evidence that Petitioner had an honest or reasonable belief that he was in imminent danger of being killed or seriously injured and that a rational view of the evidence did not support an instruction on self-defense.  See 1/28/16 Trial Tr. at PageID.908–912.  The Michigan Court of Appeals concluded that, because there was no evidence that the victim acted aggressively toward Petitioner before the victim's death, the trial court did not abuse its discretion when it refused to instruct the jury on self-defense.  Dillard, 2107 WL 3567546, at *4.

Petitioner "has picked a difficult hill to climb in claiming the jury instruction ruling was contrary to federal law" because "federal habeas applies only to convictions that offend the Constitution, laws, or treaties of the United States," and "instructional errors of state law generally may not form the basis for federal habeas relief." Keahey, 978 F.3d at 478 (punctuation modified). The Supreme Court has never invoked the principle that a criminal defendant has a constitutional right to present a complete defense "to squarely establish[ ] a federal right to a self-defense instruction." Id. (punctuation modified).  In Gilmore v. Taylor, 508 U.S. 333, 344 (1993), the Supreme Court  "rejected the argument that 'the right to present a defense includes the right to have the jury consider it' because 'such an expansive reading of [its] cases would make a nullity

of the rule . . . that instructional errors of state law generally may not form the basis for federal habeas relief.'" Id. at 479 (quoting Gilmore, 508 U.S. at 344).

Because the Supreme Court has never clearly established a constitutional right to a self-defense instruction, and because the Michigan Court of Appeals did not unreasonably apply any Supreme Court decisions when reviewing Petitioner's claim, Petitioner has no basis for habeas relief under § 2254(d)(1). See id. "Declining to grant a request to present a state-created, not federally required, defense is . . . at worst . . . an error of state law; and . . . a violation of state law does not violate the Constitution." Id. (punctuation modified).

Even if a constitutional right to present a defense of self-defense existed, under Michigan law, an individual who is not engaged in the commission of a crime may use deadly force against another person only if either one of the following situations applies:

> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

> (b) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent sexual assault of himself or herself or of another individual.

Mich. Comp. L. § 780.972(1)(a)–(b).

Petitioner did not testify at trial or present any witnesses on his behalf, and there was no evidence that he thought deadly force was necessary to prevent death, great bodily harm, or an imminent sexual assault.[2]  The evidence indicated that Petitioner gained control of the victim's

---

[2] In an affidavit attached to Petitioner's state appellate brief, Petitioner stated that he acted in self-defense when the victim was killed.  Aff. of Defendant-Appellant at PageID.1059–1061 (Dkt. 10-11).  He asserted that the victim wanted to buy marijuana from him, but he did not want to make the exchange at Super Grant and that when he tried to get out of the victim's vehicle, the victim grabbed him and pointed a gun at him.  Id.  Petitioner also stated that he raised his hand and tussled with the victim over the gun, and then the gun went off.  Id.  According to Petitioner,

gun and then shot the victim with the victim's own gun.  Additionally, as explained by the

Michigan Court of Appeals:

> The fact that there was no evidence that [the victim] and defendant had not
> interacted with one another until September 24, 2015, has no bearing on whether
> defendant killed [the victim] in self-defense.  Even if defendant and [the victim]
> were strangers to one another prior to September 24, 2015, defendant fails to
> explain how this demonstrates that he believed that he had to use deadly force to
> prevent imminent death, great bodily harm, or sexual assault.  Similarly, [the
> victim's son's] testimony that [the victim] stored his revolver in the center console
> of his vehicle does not pertain to any of the elements of self-defense.  And while
> [the victim's] blood alcohol content at the time of his death was high, defendant
> does not explicate as to how that fact relates to the elements of self-defense.

Dillard, 2017 WL 3567546, at *3.  Moreover, defense counsel conceded that Petitioner could have

looked in the center console of the vehicle while the victim went into one of the liquor stores, and

the trial court did not accept defense counsel's proposition that people who drink are necessarily

aggressive.  1/28/16 Trial Tr. at PageID.896–897, 910.

A trial court's failure to give a requested self-defense instruction does not deprive a

defendant of the constitutional right to due process when, as is true in this case, "the evidence

produced during trial was insufficient to warrant such an instruction."  Allen, 845 F.2d at 617; see

also Taylor, 288 F.3d at 851 (holding that a failure to instruct a jury on self-defense violates a

criminal defendant's rights under the due process clause "when the instruction has been requested

and there is sufficient evidence to support such a charge").  Petitioner, therefore, is not entitled to

---

he then exited the vehicle and left.  Id.  Petitioner asserted that he was scared and that he never
saw the victim's phone.  Id.
    Petitioner did not attach the affidavit to his habeas petition, and the Michigan Court of
Appeals did not consider the affidavit because it was not properly within the record on appeal.
See Dillard, 2017 WL 3567546, at *3.  A habeas court's "review under § 2254(d)(1) is limited to
the record that was before the state court that adjudicated the claim on the merits," Cullen v.
Pinholster, 563 U.S. 170, 181 (2011).  Because Petitioner's affidavit was not properly before the
Michigan Court of Appeals, which was the only state court to adjudicate Petitioner's claim on
the merits, this Court may not consider the affidavit as support for his claim.

relief on his claim that the trial court deprived him of his rights to due process and a fair trial when it did not provide a self-defense instruction.

### b. Unpreserved Issues

Petitioner argues that the trial court should have given two jury instructions that he did not request. First, he contends that the court should have instructed the jury on prior inconsistent statements used to impeach a witness because Ward was impeached with a prior inconsistent statement that she made to the police. Pet. at PageID.52–55. Petitioner maintains that the court erred in not informing the jury that the prior statement was not evidence that what Ward first told the police was true. Id. He states that the trial court should have given the jury this information during its charge to the jury and during its supplemental instructions to the jurors after the jurors asked to see the video of Ward's interview with the police. Id.

Second, Petitioner argues that the trial court should have instructed the jury on the out-of-court statements attributed to him at trial. Id. at PageID.55. He maintains that the trial court should have read M Crim JI 4.1, which would have clarified that it was up to the jury to determine whether Petitioner made the statements before they considered the content of the statements. Id.

The Michigan Court of Appeals found that Petitioner waived appellate review of his two claims because defense counsel approved of the instructions that the trial court read to the jury. Dillard, 2017 WL 3567546, at *4. The record supports the Michigan Court of Appeals' conclusion. Defense counsel made no request for jury instructions on prior inconsistent statements or statements made by a defendant. When the trial court asked the parties whether they were satisfied with the instructions as given, defense counsel responded that he was satisfied. 1/28/16 Trial Tr. at PageID.966–967. On the following day, after the jurors began their deliberations, jurors asked to see the video of Ward's interview with the police. Before responding to the juror's

request, the trial court proposed to the parties that it planned to tell the jurors that the interview was not introduced as substantive evidence, that it was not an exhibit, and that it could not be shown. 1/29/16 Trial Tr. at PageID.973–975. The court then asked whether the parties agreed with that approach, and defense counsel answered, "Yeah. Absolutely, Your Honor." Id. at PageID.975.

Petitioner waived review of his claim regarding the lack of jury instructions on prior inconsistent statements and a defendant's out-of-court statements by affirmatively approving the instructions read to the jury, Tackett v. Trierweiler, 956 F.3d 358, 371 (6th Cir. 2020), and by agreeing in open court with the trial court's proposed course of conduct, United States v. Hall, 373 F. App'x 588, 592 (6th Cir. 2010). The Court, therefore, is not required to address Petitioner's unpreserved claims on the merits. See Montgomery, 998 F.3d at 697–698.

Because none of Petitioner's claims warrants relief, the Court denies the habeas petition.

## B. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. Fed. R. App. P. 22. A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy 28 U.S.C. § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (punctuation modified).

In this case, reasonable jurists would not debate the Court's conclusion that none of the claims in the habeas petition warrant relief.  Therefore, the Court denies a certificate of appealability.

### C.  Leave to Proceed **In Forma Pauperis** on Appeal

While a certificate of appealability may be granted only if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant a request to proceed in forma pauperis on appeal if it finds that an appeal can be taken in good faith.  Foster v. Ludwick, 208 F. Supp. 2d 750, 764–765 (E.D. Mich. 2002); 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(2). "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits.  Foster, 208 F. Supp. 2d at 765.  The Court finds that an appeal could be taken in good faith.  Therefore, Petitioner may proceed in forma pauperis on appeal.

## IV. CONCLUSION

For the reasons set forth above, the Court denies the petition for a writ of habeas corpus, denies a certificate of appealability, and grants leave to proceed in forma pauperis on appeal.


SO ORDERED.


Dated: January 13, 2022                         s/Mark A. Goldsmith
      Detroit, Michigan                         MARK A. GOLDSMITH
                                          United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 13, 2022.

s/Karri Sandusky
KARRI SANDUSKY
Case Manager